IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00333-PAB-KLM

MUNEEB CHAWLA, an individual,

     Plaintiff,

v.

LOCKHEED MARTIN CORPORATION, a Maryland corporation,

     Defendant.

_____

**ORDER**

_____

     This matter is before the Court on Defendant's Motion for Summary Judgment
[Docket No. 34] filed by defendant Lockheed Martin Corporation ("LMC").  The Court
has subject matter jurisdiction over plaintiff Dr. Muneeb Chawla's Title VII claims
pursuant to 28 U.S.C. § 1331 and over plaintiff's state law claims pursuant to 28 U.S.C.
§ 1367.

**I. BACKGROUND**[1]

     LMC designs and manufactures sophisticated technology systems for use in the
space and defense industries.  Docket No. 34 at 2, ¶ 1.  Dr. Chawla began working for
LMC as a Level 2 Electrical Engineer upon his graduation from college.  *Id.* at 2, ¶ 2.
Dr. Chawla was hired on August 19, 2004.  Docket No. 34-2 at 6, p. 62:15-24.  He
completed his Ph.D. in 2009.  *Id.* at 3, ¶ 12.  Dr. Chawla is half Pakistani and half Indian
and identifies as a Muslim.  *Id.* at 2, ¶ 3.  He did not discuss his religion with his co-

_____

     [1]The following facts are undisputed unless otherwise indicated.

workers.  *Id.*

**A.  LMC HR Procedures**

For each of its employees, LMC conducts a Performance Assessment and

Development Review ("PADR") at the end of each year, in which supervisors provide

feedback regarding work performance.  *Id.* at 2, ¶ 4; Docket No. 34-2 at 5, p. 59:15-21.

Employees can receive one of five ratings: exceptional contributor, high contributor,

successful contributor, basic contributor, or unsatisfactory.  Docket No. 34 at 2, ¶ 4;

*see, e.g.*, Docket No. 34-6.

Employees assigned to special programs[2] who are rated as basic contributors

are placed on a performance improvement plan ("PIP").  Docket No. 37-6 at 4, p. 35:21-

23; *see, e.g.*, Docket No. 35-2 at 1 ("***Required for all Special Programs-assigned***

***employees rated Basic Contributor***" (emphasis in original)).  A PIP is created by an

employee's manager and contains multiple objectives and goals for the employee to

accomplish.  *See, e.g.*, Docket No. 37-7.  The employee is given a timeframe in which

to complete the PIP and must attend regular progress meetings with his or her

manager.  *See, e.g.*, *id.* at 2.

A manager seeking to discipline an employee will generally file a complaint with

human resources ("HR"), who will then investigate the complaint.  *See, e.g.*, Docket No.

41-14.  Once an investigation is complete, disciplinary action is subject to multiple

levels of review.  The Administrative Review Committee ("ARC") reviews "cases

---

[2]The term "special programs" is not explicitly defined in the record, but neither
party appears to dispute that Dr. Chawla worked in special programs for the duration of
his employment.  Docket No. 34-2 at 4, p. 56:10-13.

involving allegations of misconduct . . . excluding . . . minor infractions of policy such as traffic citations and attendance-related violations for which the discipline is less than a suspension . . . ." Docket No. 36-2 at 5. The ARC has the authority to make final decisions for those infractions where the discipline is verbal or written counseling, but makes recommendations to the Executive Review Committee ("ERC") for all those cases where the ARC determines suspension, demotion, or termination of employment is appropriate and for cases involving allegations to be reviewed only by the ERC, as discussed below. *Id.* The ERC makes the final disciplinary decision with respect to cases involving, as relevant here, "mischarging or miscoding of work time," unlawful discrimination, harassment, or other misconduct involving violation of LMC's equal employment opportunity policies, and any misconduct where suspension, demotion, or termination has been recommended by the ARC. *Id.* at 5. An employee receiving discipline from the ERC may appeal the decision to the Executive Appeal Committee ("EAC"), which will review the employee's grounds for appeal and whether:

- The disciplined employee was made aware of the allegations.

- The disciplined employee was afforded an opportunity to provide an answer to the allegations both orally to the investigator, and in writing.

- The appropriate witnesses were interviewed.

- The ARC or ERC had reasonable basis in fact to make the determination.

- The discipline imposed was appropriate for the substantiated allegations.

*Id.* at 6. Per LMC policy, the ARC must ensure that the accused employee has had the opportunity to provide his or her account of the events to an investigator or in a written

3

statement.  *Id.* at 5.  However, the accused employee is not permitted to personally appear before the ARC, ERC, or EAC.  *Id.* at 5-6.

### B.  2004-2011 PADRs

Dr. Chawla's 2004 PADR was completed by Gary Gardner.  Docket No. 34-5 at 1.  Mr. Gardner rated Dr. Chawla as a basic contributor.  *Id.*  In 2005, Dr. Chawla's supervisor, Mark Evans, rated Dr. Chawla as a successful contributor.  Docket No. 34-6 at 1.  In 2006, the work area Dr. Chawla was involved in was subcontracted out, which resulted in Dr. Chawla being placed in LMC's layoff pool.  Docket No. 34 at 2, ¶ 7. Rodger Nichols selected Dr. Chawla to work in Military Support Programs ("MSP") in an analysis group and, between 2006 and June or July of 2009, Mr. Nichols was Dr. Chawla's direct supervisor and remained a functional manager[3] of Dr. Chawla until Dr. Chawla's termination.  Docket No. 34-2 at 9, p. 75:4-10; Docket No. 34-7 at 2, pp. 9:25-11:3.  In 2006 and 2007, Mr. Nichols rated Dr. Chawla a successful contributor and listed areas in which Dr. Chawla could improve.  *See* Docket No. 34-8 at 1; Docket No. 34-9 at 1.  In a 2008 PADR, Scott Perry rated Dr. Chawla a successful contributor. Docket No. 34-10.  Mr. Nichols recalled that, toward the end of his tenure as Dr. Chawla's direct supervisor, some of Dr. Chawla's co-workers complained that Dr. Chawla was disrespecting them, but Mr. Nichols did not remember the exact details of such complaints.  Docket No. 34-7 at 2-3, p. 12:19-13:24.

In June or July of 2009, Bradley Hooker became Dr. Chawla's direct supervisor

---

[3]A functional manager is not responsible for an employee's day to day work, but instead oversees personnel, tools, training, and technical validation.  Docket No. 34-7 at 2, pp. 9:25-11:3.

and promoted Dr. Chawla to Systems Engineer Staff, a Level 4 position that resulted in

a pay raise.  Docket No. 34 at 3, ¶ 12; Docket No. 34-2 at 12, p. 86:3-4.  In Dr.

Chawla's 2009 and 2010 PADRs, Mr. Hooker rated Dr. Chawla as a successful

contributor and also listed areas in which Dr. Chawla could improve.  Docket No. 35;

Docket No. 35-1 at 1.  Mr. Hooker testified that, at the end of 2010, Dr. Chawla's

performance deteriorated in such a way that Mr. Hooker contacted HR asking to

retroactively change Dr. Chawla's PADR rating to "basic contributor," but was

unsuccessful.  Docket No. 34-12 at 9, pp. 174:20-175:15.  On April 26, 2011, Mr.

Hooker placed Dr. Chawla on a PIP (the "2011 PIP") because of dissatisfaction with Dr.

Chawla's performance, including a customer complaint that Dr. Chawla failed to attend

an off-site customer meeting and a customer complaint about "verification reports."  *Id.*

at 1, pp. 119:20-120:11.  Mr. Nichols signed the 2011 PIP, along with Mr. Hooker, Dr.

Chawla, and Jennifer Kaplan from HR.  Mr. Nichols testified that Dr. Chawla was placed

on the 2011 PIP because of work-related errors and "relationship problems with a large

percentage of the people he worked with."  Docket No. 35-2 at 2; Docket No. 34-7 at 8,

pp. 59:25-60:4.  The 2011 PIP contained five separate objectives, all of which Dr.

Chawla was required under the PIP to complete by July 26, 2011.  Docket No. 35-2 at

1-2.  Mr. Hooker and Dr. Chawla regularly discussed Dr. Chawla's progress.  Docket

No. 34 at 4, ¶ 18.  Dr. Chawla was rated unsuccessful on one objective, successful on

one objective, and marginal on three objectives, Docket No. 41-12; however, the parties

dispute whether this constitutes a successful completion of the 2011 PIP.  Dr. Chawla

stated, "I believe I successfully completed the [2011 PIP] based on my efforts."  Docket

No. 41-2 at 3, ¶ 24.  Mr. Nichols and Mr. Hooker testified that, in order to be removed

from a PIP, an employee must complete all objectives, which Dr. Chawla failed to do.

Docket No. 34-7 at 9, p. 66:3-18; Docket No. 34-12, at 4, pp. 133:18-134:8.  Mr. Hooker

testified that Mr. Hooker did not formally close the 2011 PIP with Dr. Chawla.  Docket

No. 37-8 at 6.

### C.  Mischarging Investigation

In 2011, Dr. Chawla was the subject of a LMC investigation for mischarging his

time.  In general, LMC employees' time is charged directly to LMC's customers.  Docket

No. 34 at 5, ¶ 23.  MSP employees had classified computers at their workstations,

which were used to perform work related to MSP.  Docket No. 34 at 5, ¶ 22.

Unclassified computers were also available in certain areas of the building where MSP

employees worked and were shared among MSP employees.  Docket No. 34-11 at 5,

p. 34:15-17; Docket No. 34-3 at 1, p. 103:5-25.  Unclassified computers were used, for

example, to enter time, to complete training, or to check personal email.  Docket No.

34-3 at 1, p. 104:1-6.  On July 28, 2008, LMC issued a memorandum warning

employees that there was "zero tolerance for improper use of Lockheed Martin assets,

including its network."  Docket No. 36 at 1.  The Personal Use of Lockheed Martin

Assets policy stated that personal use of LMC property "must take place during non-

work time, be of reasonable duration and frequency, and must not interfere with or

adversely affect the employee's performance or other organization requirements."

Docket No. 36-1 at 1, ¶ 3.1.  The policy further admitted that, although "reasonable" use

was difficult to quantify, the final determination of appropriate use under the policy "is

reserved to cognizant management."  *Id.* at 2, ¶ 3.2.

The timing of the mischarging allegations and corresponding investigation is in

dispute.  Dr. Chawla argues that Mr. Hooker initiated the mischarging investigation "in response to and in retaliation for my travel plans to visit family in Qatar and Pakistan." Docket No. 41-2 at 3, ¶ 22.  On March 24, 2011, Dr. Chawla submitted to LMC security his Qatar and Pakistan vacation plans.  Docket No. 41-26; Docket No. 41-8 at 4, p. 139:7-25.  It is undisputed that, on March 24, 2011, Mr. Hooker submitted to HR a formal Employee Complaint Intake Questionnaire, where Mr. Hooker stated:

> On Feb 3, 2011, I had a discussion with the HRBP, who recommended I ask the employee to account for his time.  I had that discussion on Feb 7, 2011 and did not receive a specific answer to my question.  Since that time, Muneeb has been at his desk noticeably more and I've not had further concerns.

Docket No. 41-14.  Although LMC managers are generally sent an email notifying them of pending requests for travel, Dr. Chawla does not identify any evidence indicating how quickly a manager receives such notification after an employee submits a travel request.  Docket No. 41-8 at 4-5, p. 139:14-140:5 ("Q.  When does the manager receive the e-mail after the Fast Track?  Right away?  A.  I don't know.").  LMC disputes that Mr. Hooker's formal complaint was the first instance in which Mr. Hooker raised mischarging allegations with HR.  Mr. Hooker testified that, prior to February 2011, he observed Dr. Chawla using unclassified computers in other parts of the building and received complaints that Dr. Chawla was wasting time by socializing with co-workers. Docket No. 34-11 at 5, pp. 33:21-34:21.  Mr. Hooker testified that these things caused him to be concerned that Dr. Chawla might be mischarging his time, concerns which he reported to HR.  *Id.* at 5, p. 35:13-24.  LMC argues that Mr. Hooker first took his concerns to HR in February 2011 and cites Mr. Hooker's deposition testimony in support of its claim.  Docket No. 42 at 6, ¶ 98 (citing Docket No. 42-2 at 3, p. 40:2-5 (Q:

Okay.  And when did you speak with Ms. Graves?  What date, approximately?  A: It

would have been triggered by that same February 3rd, 2011 e-mail . . . .")).[4]

On April 12, 2011, Mr. Mauro began investigating allegations that Dr. Chawla

was mischarging his time and misusing company assets.  Docket No. 35-5 at 1, 3.  A

forensic analysis of Dr. Chawla's internet proxy data revealed that Dr. Chawla "visited . .

. non-work related sites during normal business hours and accrued a total of **fifty-three**

**(53) hours and one (1) minute** of non-work related computer activity during the months

of November and December 2010, and in January 2011."  *Id.* at 5 (emphasis in

original).  More specifically, Dr. Chawla was found to have spent over an hour a day on

non-business related websites on twenty-three occasions during the subject three

month time period, including 23 hours in January 2011 alone.  *Id.* at 9.  Dr. Chawla

does not dispute the accuracy of the forensic analysis, Docket No. 34-3 at 3, pp.

109:20-110:3, and admitted that he had conducted trading and financial transactions

during the subject time period.  *Id.* at 2, p. 108:14-24.  During the investigation, Dr.

Chawla admitted to Mr. Mauro that he did not make up any of the time he spent on non-

work related websites.  Docket No. 35-5 at 15.  After his initial interview with Mr. Mauro,

Dr. Chawla sent Mr. Mauro a written statement, which stated, in part, "I do not accept

nor do I reject the allegations brought up against me.  . . . Visiting of financial websites .

. . are common practice across the MSP program."  Docket No. 35-6 at 2.  Dr. Chawla

---

[4]Mr. Hooker submitted notes, which he began creating in January 2011, to investigator Tony Mauro in support of the mischarging investigation.  Docket No. 41-9 at 3-4, pp. 42:3-43:11.  Mr. Hooker admitted to backdating notes from spring and fall of 2010, but his deposition testimony is unclear as to what role the backdated notes had in the initiation of the mischarging investigation.  *See id.*  Dr. Chawla does not otherwise explain the substance or significance of Mr. Hooker's backdated notes.

testified that he told Mr. Mauro of another employee, Brooke Mitchell, who had been reported for mischarging, but "nothing had come of it."  Docket No. 34-3 at 3, p. 111:2-22.  Dr. Chawla asserts that LMC does a forensic analysis of an employee's computer use only when a complaint is being investigated such that Dr. Chawla was unable to compare his own non-work related use of computers with that of his co-workers. Docket No. 41 at 8, ¶ 39.  Mr. Nichols testified that employees under his supervision use the computer for personal reasons during business hours and that, in general, such behavior is not inappropriate provided that such computer use is done on the employee's own time.  Docket No. 34-7 at 5, pp. 39:3-40:5 ("You're supposed to do it on your own time.  You cannot charge the government for doing personal things on computers.").  Dr. Chawla testified that he did not complain to anyone regarding the fairness of Mr. Mauro's investigation and did not have any knowledge that Mr. Mauro was discriminating against him for any reason.  Docket No. 34-3 at 4, p. 113:5-13.

Mr. Mauro's investigation findings were referred to the ARC, which was composed of Robin Valore, HR director, June Taylor, senior manager of the equal opportunities program, and Mr. Nichols, the manager representing the MSP.  Docket No. 34 at 6.  Because Mr. Hooker was the complaining party, per LMC policy, he was not permitted to participate in the ARC's decision.  Docket No. 34-11 at 7, pp. 50:23-51:6 ("the reason we do that is to ensure that it's fair and it's not based on, for instance, a bias of mine").  The ARC substantiated the allegations and recommended termination.  Docket No. 36-3 at 1.[5]   The ERC reviewed the ARC's recommendation.

---

[5]Dr. Chawla argues that Ms. Valore and Ms. Taylor "should have been aware of Plaintiff's complaints of discrimination and harassment in the workplace," but does not

Docket No. 34 at 7, ¶ 35.  The ERC was composed of Monty Pierce, HR director, and Marshall Case, vice president of infrastructure, neither of whom had ever met Dr. Chawla or were aware of his ethnicity, religion, or whether he had complained of discrimination or harassment.  *Id.* at 7, ¶¶ 36-37.  The ERC "determined the allegations of charging practices to be inconclusive and the allegations of misuse of assets to be substantiated" and suspended Dr. Chawla for two weeks.  Docket No. 36-3.  Dr. Chawla served his suspension from August 18, 2011 through September 6, 2011.  Docket No. 34 at 8, ¶ 43.  On September 16, 2011, Dr. Chawla appealed his suspension to the EAC, claiming that his "struggling work relationship" with Mr. Hooker was due to "my Pakistani and Muslim background, where demeaning comments have been made to me with regards [sic] to this."  Docket No. 41-18.  The EAC, composed of Armando Castorena, vice president of HR, and Paul Regan, vice president of business and finance, Docket No. 34 at 7, ¶ 40, reviewed Dr. Chawla's appeal and the investigation report and supporting documentation and denied Dr. Chawla's appeal.  Docket No. 34 at 8, ¶ 42; Docket No. 36-11.[6]

### D.  2011 PADR and 2012 PIP

On December 16, 2011, Dr. Chawla was rated as a basic contributor on his 2011

---

cite any evidence in support of this assertion.  Docket No. 41 at 7, ¶ 34.  Dr. Chawla testified that Mr. Nichols knew Dr. Chawla was half Pakistani and half Indian, but had no reason to believe that, at the time, Mr. Nichols knew that Dr. Chawla was Muslim. Docket No. 34-3 at 7, pp. 126:15-127:12.

[6]Although the EAC's decision contains Richard Kludt's signature, not Mr. Castorena's, Mr. Kludt left LMC in March 2011.  Docket No. 41-20 at 10-11, pp. 35:19-36:17.  Mr. Castorena could not explain why Mr. Kludt's signature was on the EAC's decision, but Dr. Chawla does not dispute that Mr. Castorena was on the EAC that considered his appeal.

PADR.  Docket No. 37-5 at 1-2.  Mr. Hooker testified that he and Mr. Nichols provided

the rating.  Docket No. 34-12 at 10-11, pp. 196:25-197:3.  The PADR stated, in part,

> Muneeb has struggled to deliver acceptable performance this year.
>
> . . . [He] received unsatisfactory feedback from the customer.  The feedback resulted from poor attention to detail, not ensuring the delivery of quality analysis reports, and ineffective discussions with the customer consultant to address concerns.
>
> . . . He missed a mandatory team offsite in preparation for an important exercise to prepare for PI, and it turns out he had not supported meetings in a previous exercise.  As a result, the customer consultant, customer, and an audit team all expressed concerns about Muneeb's poor performance and he was removed as a test case lead . . . .
>
> Muneeb was assigned to work across the team to compile a data review.  He did not follow-up and other team members were pulled from other tasks to work overtime to pull the review together at the last minute.
>
> Several team members communicated their feedback on Muneeb's poor performance to his manager.
>
> *       *       *
>
> Muneeb can be productive, but he often produces poor quality work and relies on others to review, for example, not changing the effectivity on a reused analysis report.

Docket No. 37-5 at 1.  The PADR also stated that Dr. Chawla was "marginally

successful" in completing the 2011 PIP.  *Id.*

HR suggested that Dr. Chawla be issued a second performance improvement

plan (the "2012 PIP"), which Mr. Hooker decided to do.  Docket No. 34 at 9, ¶ 51;

Docket No. 34-12 at 4-5, pp. 134:17-137:18.  As noted above, basic contributors in

special programs are required to be put on PIPs, but Dr. Chawla claims that the

decision to place him on the 2012 PIP was solely Mr. Hooker's.  Docket No. 41-2 at 4, ¶

26.  Ms. Garfield, who succeeded Mr. Hooker as Dr. Chawla's supervisor, admitted that,

were it not for LMC policy, she would not have placed Dr. Chawla on the 2012 PIP.

Docket No. 37-6 at 5, p. 40:18-21.  Dr. Chawla suggests that Mr. Hooker applied this

LMC policy in a discriminatory manner, arguing that Mr. Hooker rated LMC employee

Ted Wolk a basic contributor in 2010 but did not place him on a PIP.  Docket No. 41 at

17, ¶ 113.  Mr. Hooker explained his decision with regard to Mr. Wolk as follows:

> Q. . . . So it was your understanding that it was a requirement to place [Mr. Wolk] on a PIP?
>
> A.  Actually, yes.  2010, the line of business said everybody that is rated a basic contributor should be placed on a performance improvement plan.
>
> Q.  And you did not place Mr. Wolk on a performance improvement plan?
>
> A.  Correct.
>
> Q.  Because you felt that he had improved?
>
> A.  No, it was workload.  I literally never got to Mr. Wolk's performance improvement plan.  And it was not a high priority because, again, I felt his performance with verbal counseling and such, he really turned his performance around at the end of 2010.

Docket No. 41-9 at 11, p. 116:8-23.

Mr. Hooker subsequently transitioned into a different management role and, on

January 28, 2012, Stacy Garfield replaced Mr. Hooker as Dr. Chawla's direct

supervisor.  Docket No. 34 at 9, ¶ 50.   The record indicates that Mr. Hooker, Mr.

Nichols, and Ms. Garfield had some role in drafting the 2012 PIP.  Docket No. 34-12 at

4-5, pp. 134:17-137:18; Docket No. 34-7 at 10, p. 71:13-15; Docket No. 37-8 at 6.  On

February 10, 2012, Ms. Garfield delivered the 2012 PIP to Dr. Chawla.  Docket No. 34

at 9, ¶ 51.  The 2012 PIP contained six objectives and was scheduled to conclude on

May 10, 2012.  Docket No. 37-7.  Ms. Garfield and Dr. Chawla met biweekly to discuss

progress on the 2012 PIP, and Dr. Chawla understood that failure to complete the 2012

PIP could result in termination.  Docket No. 34 at 10, ¶¶ 52, 53.

Ms. Garfield determined that Dr. Chawla was unsuccessful in completing the

2012 PIP, testifying that Dr. Chawla's "interactions with co-workers and customers was

still very negative and disruptive, and completion of some of the tasks was not to the

level of expectations for his labor grade."  Docket No. 37-6 at 6, p. 41:6-9.  Ms. Garfield

provided her assessment regarding the 2012 PIP to HR, *id.* at 12, p. 80:16-19,

expressing concerns that Dr. Chawla's working relationship with co-workers was

"broken and beyond repair," that Dr. Chawla's relationship with customers was such

that "he can have no further interactions with the PLC Customer," and recommended

that Dr. Chawla be demoted to a "labor grade 2 engineer."  Docket No. 41-22 at 1-3.

### E.  2012 Investigation and Termination

After receiving Ms. Garfield's assessment, Jennifer Kaplan, an HR staff member,

conducted an investigation.  Docket No. 37-8.  Ms. Kaplan investigated the allegations

of deficient job performance due to Dr. Chawla's basic contributor rating in 2011, failure

to complete the 2012 PIP between February 10 and May 10, 2012, and a continued

lack of performance after May 10, 2012.  Docket No. 37-8 at 3.  The report contained

information about the mischarging investigation, previous PADRs, and the 2011 and

2012 PIPs.  *Id.* at 10.  The report noted that Ms. Garfield observed Dr. Chawla

continued to "make reporting and other errors," "not perform work assigned to him by

his leader," "delegate[] tasks assigned to him by his leader," and "communicate in a

confrontational and non-productive manner that prevents meaningful conversation."

Docket No. 37-8 at 9-11.   Ms. Kaplan's investigation determined that "Muneeb's leader

has assessed that he has failed his Performance Improvement Plan from February 10th,

2012 through May 10th, 2012 and had demonstrated continued lack of performance

from May 10th, 2012 through July 12th, 2012.  The facts support this assessment."  *Id.* at

12.

Ms. Kaplan's report was forwarded to the ARC, which was composed of Ms.

Valore, Helen Finneran, HR director, and Buddy Hayes, organization manager.  Docket

No. 34 at 13, ¶ 73.  The ARC recommended terminating Dr. Chawla's employment.

Docket No. 39-3.  The ARC's recommendation was forwarded to the ERC, which was

composed of Mr. Pierce and Rick Facchinello, vice president of finance.  *Id.*  Dr. Chawla

does not identify any evidence that would reasonably suggest that Mr. Pierce or Mr.

Facchinello were aware of Dr. Chawla's national origin, religion, or prior complaints of

harassment and discrimination.  Docket No. 34 at 13, ¶ 76; Docket No. 41 at 12, ¶ 76;

*cf.* Docket No. 39-6 at 2, ¶ 5 ("I never met Dr. Chawla and do not know his race,

ethnicity, national origin, religion, or whether he complained of discrimination or

retaliation at the time while he worked at LMC."); Docket No. 34-4 at 7, pp. 213:24-

214:7 ("Q. As of July 25, 2012, do you have any reason to believe either Mr. Pierce or

Mr. Fachinello knew that you were Muslim?  A.  . . . I would say no to the entire chain.

Q.  Okay.  So the same for national origin and race?  A.  Correct.").  The ERC

concurred with the ARC's recommendation.  Docket No. 39-3.  On July 26, 2012, LMC

notified Dr. Chawla that his employment was terminated as a result of "Poor

Performance in violation of N1.5.1-T2-HRMgt-I.3-D, Conduct and Disciplinary Action for

Salaried Employees."  Docket No. 39-7.  Mr. Nichols testified that Dr. Chawla was

terminated "[f]or inadequate performance and not performing — not successfully completing the two PIPs."  Docket No. 34-7 at 13, p. 97:17-19.

On August 1, 2012, Dr. Chawla appealed his termination to the EAC, arguing that the factual basis for his termination was unfounded and that his termination was in retaliation for his harassment complaints and Equal Employment Opportunity Commission ("EEOC") charge of discrimination.  Docket No. 39-8.  The EAC was composed of Mr. Castorena and Mr. Regan, vice president of business operations.  The EAC concluded that, "[a]fter a thorough review of the records, including Dr. Chawla's written appeal, the Executive Appeal Committee agrees with the determination of the ARC and ERC, and therefore denies Dr. Chawla's appeal."  Docket No. 39-3.  LMC did not fill Dr. Chawla's position after his employment was terminated – Ms. Garfield testified that current employees were able to pick up Dr. Chawla's work and complete it successfully.  Docket No. 37-6 at 2, p. 15:12-14.

### F.  Discrimination Complaints

#### 1.  *August 2, 2011 and September 22, 2011*

In an August 2, 2011 email to Mr. Mauro, sent at 10:17 a.m., Dr. Chawla made his first complaint of discrimination.  Docket No. 34 at 8, ¶¶ 44-46; Docket No. 34-3 at 11, p. 148:13-17. .[7]  The email stated, in part:

_____

[7]Dr. Chawla later sent a revised version of the email without such allegations, which, as noted above, was incorporated into the mischarging investigation.  *See* Docket No. 34-3 at 11, pp. 147:7-148:21.  When asked about the two different emails, Dr. Chawla testified that he spoke with Mr. Mauro, who told him that "in order to get a result, it's good to have something substantial, such as an e-mail, or a conversation, or a recording."  *Id.*  Having none of these things, Dr. Chawla elected to send Mr. Mauro a revised version of his email, which did not contain discrimination and harassment allegations against Mr. Hooker, and told Mr. Mauro about the earlier email, "This is my

> I truly believe these minuet [sic] infractions are being brought up against me due to my Pakistani and Muslim background, which is not common at all in our MSP program.  My manager put me on a PIP (performance improvement plan) just weeks after I planned a trip to Qatar and Pakistan.  Furthermore, I'm the only person with such a background in Brad Hooker's group.  I have discussed several issues with Tony Mauro about my ongoing struggling work relationship with Brad Hooker even since he became my manager.  I also discussed having had to struggle with him to get a promotion for finishing my PhD in Engineering and the struggles that continued thereafter due to Brad's hidden agendas and motives.

Docket No. 37.  Mr. Mauro apprised HR of these concerns, and Whitney Bealor began an investigation.  Docket No. 34 at 8, ¶¶ 46-47.  As part of the investigation, on September 22, 2011, Dr. Chawla submitted an additional written statement alleging that Mr. Hooker discriminated against him due to Dr. Chawla's national origin and religion.  Docket No. 37-4 at 13.  This written statement reiterated the complaints made in Dr. Chawla's August 2, 2011 email and was substantially identical to the argument Dr. Chawla made in appealing discipline from the mischarging investigation.  *Compare id.*, *with* Docket No. 37, *with* Docket No. 36-7.[8]  In discussing this written statement with the investigator, Dr. Chawla, for the first time, made specific allegations that his co-workers made harassing comments.  Docket No. 37-2 at 9, 11.  From that point on, Ms. Bealor's investigation focused on two allegations: (1) that Mr. Hooker discriminated against Dr.

---

information.  You can go ahead and move forward with the investigation if you want." *Id.*

[8]In his appeal of the discipline resulting from the mischarging investigation, Dr. Chawla asserted that Mr. Hooker's conduct was discriminatory.  Docket No. 37.  Dr. Chawla appears to claim that this written appeal constituted a separate complaint of discrimination.  Docket No. 41 at 19.  However, Dr. Chawla's written appeal was substantially identical to the written statement he provided to Ms. Bealor on September 22, 2011, which was the subject of the November 17, 2011 investigation report. *Compare* Docket No. 41-18, *with* Docket No. 37.  Dr. Chawla does not identify any material differences between the two statements.

Chawla by issuing the 2011 PIP and initiating the mischarging investigation and (2) that Dr. Chawla was harassed by co-workers.  Docket No. 37-2 at 7-8.  On September 29, 2011, Mr. Hooker was notified that he was one of the subjects of the investigation.  *Id.* at 5.

On November 17, 2011, Ms. Bealor issued an investigation report.  Docket No. 37-2.  The investigation determined that the decision to place Dr. Chawla on the 2011 PIP was based upon Dr. Chawla's performance and not his national origin or ancestry. *Id.* at 8.  Investigation of the second allegation was as follows: At the end of June 2011, after returning from his vacation to Pakistan and Qatar, Dr. Chawla had a temporary ID badge containing his picture.  Dr. Chawla claims that co-worker Jeff Barron told him that the badge picture looked like a picture of a terrorist.  Mr. Barron could not recall ever calling Dr. Chawla a terrorist.  Dr. Chawla also claimed that, after shaving his head upon returning from vacation, Christopher Harden and Ed Meek asked Dr. Chawla if the haircut was part of a ritual.  Neither Mr. Harden nor Mr. Meek recalled the incident, but stated that they do not work directly with Dr. Chawla and do not often engage him in conversation.  Docket No. 37-2 at 8.[9]  Ms. Bealor noted that Dr. Chawla presented the allegations concerning Mr. Barron, Mr. Harden, and Mr. Meek during her third meeting with Dr. Chawla.  Docket No. 37-2 at 8.  Ms. Bealor noted the conflicting testimony of

---

[9]Although Dr. Chawla did not testify during his deposition that he recalled the specific date on which these comments was allegedly made, Dr. Chawla's affidavit states that, on February 17, 2010, Mr. Meek asked Dr. Chawla if he had gotten "that wound on your head from beating yourself," which Dr. Chawla interpreted as a suggestion that the head injury occurred as a result of a Shia Muslim style self beating. Docket No. 41-2 at 2, ¶ 7.  Dr. Chawla's affidavit states that Mr. Harden's comment was made on February 21, 2010.  *Id.* at 2, ¶ 8.

Dr. Chawla and the subjects and found the subjects more credible because Dr. Chawla "had difficulty" identifying specific behavior aimed at his national origin or ancestry, Dr. Chawla did not raise such allegations until the third meeting with Ms. Bealor, and the subjects' responses were credible. *Id.* at 9.  The allegations against Mr. Hooker, Mr. Barron, Mr. Harden, and Mr. Meek were found to be unsubstantiated.  *Id.* at 8-9.

### 2. *February 14, 2012 and April 6, 2012*

On February 14, 2012, Dr. Chawla complained of discrimination by Mr. Hooker and multiple co-workers.  On February 15, 2012, Ms. Campbell and Gary Benson, an outside investigator, were assigned to investigate Dr. Chawla's complaint.  Docket No. 41 at 15, ¶ 101; Docket No. 38 at 3.  Although Ms. Campbell stated that LMC conducts investigations within thirty days of an initial complaint, Ms. Campbell did not begin investigating Dr. Chawla's complaints for six weeks.  Docket No. 41 at 16, ¶ 103.  Ms. Campbell claims that she explained to Dr. Chawla that, because of a special assignment, she would be unable to begin an investigation for five to six weeks.  Docket No. 42-3 at 2, p. 25:12-19.[10]  On April 6, 2012, Dr. Chawla emailed Ms. Campbell complaining about an interaction Dr. Chawla had with Mr. Wolk, where Dr. Chawla accused Mr. Wolk of "scrolling through my e-mails looking for the Brad Hooker email [Ms. Campbell] had showed him during your interview."  Docket No. 41-28.  Ms.

---

[10]Dr. Chawla also appears to argue that Ms. Campbell's report was dated May 24, 2012, yet contained information from a May 29, 2012 interview with Glenn Olsen. Docket No. 41 at 16, ¶ 104.  LMC explains that, during her deposition, Ms. Campbell was asked about a draft report wherein the date was not changed.  Docket No. 42 at 7, ¶ 104.  However, both parties attach to their briefs a final report from Ms. Campbell and Gary Benson dated May 29, 2012.  Thus, Dr. Chawla does not explain what inference should be drawn from this argument.

Campbell and Dr. Chawla discussed the incident during a April 12, 2012 meeting.
Docket No. 38-1 at 6.

On May 29, 2012, Ms. Campbell and Mr. Benson issued an investigation report
addressing the following allegations.  First, Dr. Chawla alleged that Mr. Hooker
discriminated and retaliated against him by placing him on the 2011 PIP and giving him
a basic contributor rating on the 2011 PADR.  Docket No. 38 at 5.  The investigation
determined that Mr. Hooker was not aware of Dr. Chawla's national origin prior to
recommending the 2011 PIP, that Dr. Chawla's 2011 PIP and 2011 PADR were
supported by specific examples and, in some instances, by Dr. Chawla's own
admissions, and that Mr. Hooker's assessments were consistent Ms. Garfield's
assessments of Dr. Chawla's performance.  *Id.* at 12.  The investigation determined
that Dr. Chawla's allegation in this regard were unsubstantiated.  *Id.*; Docket No. 38-1 at
1-2.

Second, Dr. Chawla alleged that he was harassed by Mr. Hooker when, on
November 22, 2011, Mr. Hooker sent an email to the work group, including Dr. Chawla,
which contained a cartoon referencing the "Pakistani government's failure to apprehend
Osama Bin Laden."  Docket No. 38 at 5; *see also* Docket No. 38-6 at 3.  Dr. Chawla
explained that he was offended because "just weeks after I made my plans to go on
vacation to Qatar and Pakistan, they did find Osama Bin Laden in Pakistan.  And me
being placed on a Performance Improvement Plan, I felt like what this was
communicating to me is that at Lockheed Martin, all I wanted was a job like Bin Laden
had in Pakistan, where no one knew he existed there."  Docket No. 34-3 at 14, p.
169:15-22.  Mr. Hooker admitted to the investigator that he could understand how Dr.

19

Chawla may have taken offense and further that the cartoon was inappropriate or insensitive to Dr. Chawla's national origin or religion.  Docket No. 38 at 14.  The investigation determined that the allegations related to Mr. Hooker's email were substantiated, Docket No. 38 at 14, and Mr. Hooker was given a verbal reprimand by the ERC.  Docket No. 38-7 at 1.

Third, Dr. Chawla alleged that, in the summer of 2001, Mr. Hooker "asked me which 'part' of me was Pakistani, further stating that my Pakistani and Indian ethnic halves, 'don't like each other,' and 'must be in conflict with one another.'"  Docket No. 41-2 at 2, ¶ 11.  However, Dr. Chawla did not tell Mr. Hooker that such a comment was offensive to him.  Docket No. 38 at 13.  Mr. Hooker admitted that he has inquired about Dr. Chawla's ancestry and was genuinely curious if Dr. Chawla's Indian and Pakistani background created any tension.  Docket No. 38 at 13.  In light of the fact that Dr. Chawla did not explain that this question offended him, the investigation found that Mr. Hooker was not given an opportunity to apologize and found Mr. Hooker's explanation for the question reasonable.  *Id.* at 14.  The investigation found the allegation unsubstantiated.  *Id.*

Dr. Chawla also complained that three co-workers made harassing comments based upon Dr. Chawla's national origin/ancestry.  Docket No. 34 at 11-12, ¶ 66.  Dr. Chawla claimed that co-worker Rick Keel made harassing comments including calling Dr. Chawla a "terrorist."  Docket No. 38 at 5.  The investigation determined that, in the absence of a witness corroborating Dr. Chawla's allegation, Mr. Keel's denial was credible and Dr. Chawla's allegations unsubstantiated.  *Id.* at 15.  Dr. Chawla claimed that co-worker Ted Wolk made harassing comments including calling Dr. Chawla

"Muneeb Quaddafi."  *Id.* at 5.  The investigation determined that, although Mr. Wolk's

written statement cast some doubt as to whether he made the claimed statement, no

witnesses corroborated Dr. Chawla's account and the allegation was therefore

unsubstantiated.  *Id.* at 15.  Dr. Chawla accused co-worker Glen Olsen of making

harassing comments including referring to Dr. Chawla as a "security risk."  *Id.* at 5.  The

investigation found unsubstantiated the allegation that such comments were related to

Dr. Chawla's national origin.  *Id.* at 15.  The ARC concurred in all three assessments.

Docket No. 39 at 1-3.  The ERC did not review the ARC's decision, Docket No. 41 at

17, ¶ 110, which LMC claims the ERC was not required to do because the ARC did not

substantiate the allegations against Mr. Wolk, Mr. Keel, and Mr. Olsen.  Docket No. 42

at 8, ¶ 109.

### 3.   *April 23, 2012 and May 2, 2012*

On April 23, 2012 and May 2, 2012, Dr. Chawla contacted Ms. Campbell

regarding the conduct of co-worker Larry Espelage.  Docket No. 41-29; Docket No. 41-

30.  Ms. Campbell testified that she did not combine these complaints with those Dr.

Chawla made previously because "I was in the middle of investigating the other report

at the same time I was investigating this one."  Docket No. 41-27 at 9, p. 56:9-12.  On

May 15, 2012, Ms. Campbell issued a report addressing the two incidents:

> On April 19, 2012, Espelage joined into a conversation Chawla was having
> with Ed Reilly about his difficulty in being directed to an office where he was
> supposed to deliver some documents.  On that occasion, Espelage admitted
> saying words to the effect of 'they thought you were a terrorist.'
>
> [O]n April 30, 2012 when Espelage first said to Muneeb Chawla words to the
> effect of, there is a terrorist sitting next to you.  Espelage continued walking
> to the next cube where Mansour sits and asked him, words to the effect of,

> have you ever put on a turban and tried to drive through the base. . . . He
> went on to say that Mansour laughed and said no he didn't do that.

Docket No. 39-1 at 4.  Mr. Espelage admitted to making both statements and Dr.

Chawla's allegations were substantiated.  *Id.* at 6.  The ERC suspended Mr. Espelage

for one week without pay.  Docket No. 39-4.

### 4.  EEOC Charge

On February 21, 2012, the EEOC received a charge of discrimination filed by Dr.

Chawla.  Docket No. 71-1.  The charge of discrimination alleged discrimination on the

basis of national origin, religion, and retaliation, including that Dr. Chawla's 2011 basic

contributor rating was in retaliation for Dr. Chawla's complaints of harassment.  *Id.* at 1-

2.  Dr. Chawla claims that, on April 2, 2012, Mr. Wolk interrogated him about LMC's

response to the charge of discrimination.  Docket No. 41-2 at 3, ¶ 15.  On April 2, 2012,

Dr. Chawla's attorney provided the EEOC with additional information related to Dr.

Chawla's claims.  Docket No. 71-1 at 9-12.  On June 18, 2012, LMC responded to Dr.

Chawla's charge of discrimination.  Docket No. 71-2 at 11.  On July 27, 2012, Dr.

Chawla's counsel notified the EEOC that LMC had terminated Dr. Chawla's

employment, claiming that the termination was "motivated by discriminatory animus"

and was retaliatory.  Docket No. 71-2 at 24.  On December 14, 2012, the EEOC issued

Dr. Chawla a Notice of Right to Sue.  *Id.* at 31.

### G.  Procedural History

On February 7, 2013, Dr. Chawla filed this case.  Docket No. 1.  He brings

claims under Title VII of the Civil Rights Act of 1964 for hostile work environment on the

basis of religion, hostile work environment on the basis of ethnic background, retaliation

22

on the basis of religion, retaliation on the basis of ethnic background, wrongful

discharge on the basis of religion, and wrongful discharge on the basis of ethnic

background. *Id.* at 8-13.  Dr. Chawla asserts claims against LMC under state law for

violation of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. § 24-34-401, *et seq.*,

breach of contract, promissory estoppel, wrongful discharge in violation of public policy,

and breach of the covenant of good faith and fair dealing. *Id.* at 14-17.  LMC moves for

summary judgment on all claims.  Docket No. 34 at 1.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if

under the relevant substantive law it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary

judgment. *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An

issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997).

However, "[w]hen, as in this case, the moving party does not bear the ultimate

burden of persuasion at trial, it may satisfy its burden at the summary judgment stage

by identifying a lack of evidence for the nonmovant on an essential element of the

nonmovant's claim." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998)) (internal quotation marks omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986)).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman,* 252 F.3d at 1115 (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)).  "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Discriminatory Discharge[11]

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

---

[11]The parties combine Dr. Chawla's claims related to national origin and religion into a single analysis.  After review of these claims, the Court has determined that it does not need to decide which discriminatory acts relate to national origin, which relate to religion, or which relate to both and therefore will analyze Dr. Chawla's claims in the same manner as the parties.

terms, conditions, or privileges of employment, because of such individual's race, color,

religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Dr. Chawla does not

advance direct evidence that he was fired because of his national origin or religion.

When there is no direct evidence of discrimination, a plaintiff must rely on the burden-

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973), to

show a defendant's discriminatory animus.  *See Khalik v. United Air Lines*, 671 F.3d

1188, 1192 (10th Cir. 2012) (a plaintiff can prove discrimination "by relying on the

three-part *McDonnell Douglas* framework") (internal quotation marks omitted).  Under

the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a

prima facie case of discrimination.  *Id.*  In order to make a prima facie case of disparate

treatment, a plaintiff must show three elements: (1) that he belonged to a protected

class; (2) that he suffered an adverse employment action; and (3) that the adverse

employment action occurred under circumstances giving rise to an inference of

discrimination.  *Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).[12]  If the plaintiff

succeeds in establishing a prima facie case, the burden shifts to the defendant

---

[12]The Tenth Circuit has noted that the prima facie case is sometimes articulated differently depending on the specific claim before the court.  *See id.* at 1095 n.1; *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005).  In discriminatory termination cases, the prima facie case is often broken into four elements.  *See, e.g.*, *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1150 (10th Cir. 2008) ("Generally stated, a prima facie case of discriminatory discharge under Title VII requires plaintiff to demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge.").  No matter the precise formulation, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful discrimination.'"  *Id.* at 1151 (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).

employer to state a legitimate, nondiscriminatory reason for its adverse employment action. *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1321 (10th Cir. 2004). If the defendant produces a legitimate, nondiscriminatory reason, then the court must grant the defendant summary judgment unless the plaintiff can show a genuine issue of material fact as to whether the stated reason for the adverse action is pretextual. *Id.*

LMC does not appear to dispute the first two elements of the prima facie case. Docket No. 34 at 17. Instead, LMC argues that Dr. Chawla has not established that his termination occurred under circumstances giving rise to an inference of discrimination and that Dr. Chawla has not established that LMC's legitimate, nondiscriminatory reason for his termination was pretextual. *Id.* However, plaintiff's burden to establish a prima facie case is light. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1171 (10th Cir. 2007) ("only the most baseless of [Title VII] claims fails to satisfy" the prima facie burden). The real question is "whether a plaintiff has shown actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (internal quotation and citation omitted). As such, the Court assumes, without deciding, that, for the purposes of resolving this motion, plaintiff has established a prima facie case of discrimination based on race and/or religion. *See E.E.O.C. v. PVNF, LLC*, 487 F.3d 790, 800 n.5 (10th Cir. 2007) ("Regardless of whether [courts] analyze the plaintiff's evidence in reference to the prima facie case or the business justification versus pretext inquiry, . . . if the court correctly concludes that the evidence of discrimination/pretext

fails as a matter of law, summary judgment for the defendant is the proper result." (internal citations and quotations omitted)).

LMC asserts that it terminated Dr. Chawla for poor performance, including not successfully completing the 2011 and 2012 PIPs, Docket No. 34 at 13, ¶ 78, which is consistent with the investigation that led to Dr. Chawla's termination. *See* Docket No. 37-8 at 3. Because these are reasons that are not facially prohibited, LMC has satisfied its burden to produce legitimate non-discriminatory reasons for terminating Dr. Chawla's employment. *See Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1218 (10th Cir. 2003).

The burden therefore shifts back to Dr. Chawla to show that LMC's stated reasons are pretext for unlawful discrimination. To demonstrate pretext, Dr. Chawla must produce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for" its termination decision. *See Crowe v. ADT Security Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011). Dr. Chawla may also defeat summary judgment by showing that there is a genuine dispute of material fact as to whether defendant's explanations for terminating his employment are pretextual. *See Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006).

Rather than attack the termination decision of the ARC and ERC directly, Dr. Chawla focuses on Mr. Hooker's actions, asserting that an inference of discrimination exists because (1) Mr. Hooker initiated the mischarging investigation on the same day that Dr. Chawla requested vacation time for a trip to Qatar and Pakistan, (2) upon Dr. Chawla's return from vacation, Mr. Hooker placed Dr. Chawla on the 2011 PIP "based on admittedly back-dated notes," (3) Mr. Hooker gave Dr. Chawla a basic contributor

27

rating in 2011, and (4) Mr. Hooker ordered Dr. Chawla placed on the 2012 PIP based upon an LMC policy that Mr. Hooker did not apply to similarly situated employees. Docket No. 41 at 20-21.  Dr. Chawla argues that the ARC, ERC, and EAC were "relied upon by Defendant to collectivize the decision to terminate Dr. Chawla and were nothing more than rubber stamps." *Id.* at 21.

Dr. Chawla fails to meet his burden of showing either pretext or a genuine dispute of material fact.  First, Dr. Chawla fails to set forth "specific facts," identified by "reference to affidavits, deposition transcripts, or specific exhibits" to support his contentions, which is, by itself, an independent basis for granting LMC's motion for summary judgment on these claims.  *See Adler*, 144 F.3d at 671.  Second, Dr. Chawla's focus on Mr. Hooker's actions is, in large part, irrelevant because Dr. Chawla has not shown any link between Mr. Hooker's actions and his termination.  As of January 2012, Mr. Hooker ceased to be Dr. Chawla's supervising manager and had no further involvement in implementing the 2012 PIP or in assessing Dr. Chawla's performance, nor did he have any involvement in the ARC, ERC, or EAC that considered Ms. Kaplan's report.  It is undisputed that, although the ARC could recommend termination, the final authority to terminate Dr. Chawla was vested exclusively in the ERC, the only entity with the power to issue a final disciplinary disposition "where . . . termination of employment has been recommended by the ARC."  Docket No. 36-2 at 5.

Third, given that the ERC had final decisionmaking authority, Dr. Chawla fails to identify specific facts suggesting that the ERC's decision was discriminatory.  Dr. Chawla identifies no evidence upon which a reasonable juror could conclude that Mr.

28

Pierce and Mr. Facchinello were aware of Dr. Chawla's national origin and/or religion at the time of the termination decision. *Cf. EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006) ("[I]t is undisputed that Ms. Edgar, who formally made the termination decision, worked in a different city and had no idea that Mr. Peters is black. She therefore could not have acted for racially discriminatory reasons."); *see also Owens v. Donahoe*, 913 F. Supp. 2d 1055, 1062 (D. Colo. 2012) ("if the decisionmaker is not aware of a person's race . . . it is impossible to infer that the decision was due to discriminatory intent"). Dr. Chawla attempts to cast doubt on the ERC's decision by pointing out that, in the disciplinary disposition document that resulted from the mischarging investigation, Mr. Kludt's signature appeared on the disciplinary disposition document indicating that he was a member of the ERC months after Mr. Kludt left LMC. Docket No. 41 at 21.[13] Dr. Chawla also points out that Ms. Garfield, Dr. Chawla's supervisor at the time of his termination, did not herself recommend termination. Neither occurrence evidences discriminatory animus on the part of the ERC and, if such a connection exists, Dr. Chawla fails to make it. Fourth, where, as here, the decisionmaker relies on an investigative memorandum in making the termination decision, pretext is assessed not by determining the factual accuracy of the memo, but "by examining the facts as they appear to the person making the decision to terminate" and whether the decisionmaker "reasonably 'perceived' that [the memo] was accurate." *Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1273 (10th Cir.

---

[13]Although Dr. Chawla cites no evidence in support of the contention about Mr. Kludt, LMC admits the contention in its reply brief. LMC, however, attaches evidence that Mr. Kludt's signature appears through an error unrelated to Dr. Chawla's employment. Docket No. 42 at 10 n.6.

2003).  Notably, Dr. Chawla does not identify a single inconsistency or weakness in the July 13, 2012 investigation report that should reasonably have been perceived by the ERC.

Fifth, even assuming that the ERC members could infer Dr. Chawla's national origin from his name, as a general rule, a plaintiff must "'proffer evidence that shows each of the employer's justifications is pretextual.'"  *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126 (10th Cir. 2005).  Absent that, "[i]t is not simply a question of how many of the defendant's reasons a plaintiff has refuted, but rather a question of whether casting doubt on a particular justification necessarily calls into doubt the other justifications."  *Bryant*, 432 F.3d at 1127.  Although Dr. Chawla claims that the 2011 PIP, his 2011 basic contributor rating, and the decision to place him on the 2012 PIP arose under circumstances giving rise to an inference of discrimination, he makes no attempt to rebut what appears to be the predominant reason for his termination, namely, his poor performance in 2012, including his failure to successfully complete the 2012 PIP.[14]  Dr. Chawla does not claim that Ms. Garfield or Ms. Kaplan acted with discriminatory animus and does not raise a material dispute with Ms. Garfield's assessment of his 2012 performance, including that, after May 10, 2012, he continued to "make reporting and other errors," "to not perform work assigned to him by his leader," "delegate[] tasks

---

[14]Whereas Dr. Chawla's 2011 PIP and 2011 basic contributor rating is discussed in two paragraphs, Docket No. 37-8 at 6, more than five full pages of the report are devoted to Ms. Garfield's assessment of his 2012 performance.  Dr. Chawla fails to raise a genuine dispute of fact that his 2012 performance is the predominant reason for his termination.

assigned to him by his leader," and "communicate in a confrontational and non-productive manner that prevents meaningful conversation."  Docket No. 37-8 at 9-11.

Thus, Dr. Chawla's attempt to cast doubt on LMC's other stated reasons, namely, Dr.

Chawla's work performance prior to 2012, does not cast doubt on LMC's predominant

reason for termination.  *Cf. Bryant*, 432 F.3d at 1126-27 (holding that, because plaintiff

cast doubt on the employer's dominant stated reason for her termination, "failure to

address the other, less consequential reasons for her termination does not entitle

Farmers to summary judgment").  It is not incumbent upon the Court to identify facts on

Dr. Chawla's behalf and, as such, Dr. Chawla's discriminatory termination claims fail.

*See Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1025 (10th Cir. 1992)

("we will not search the record in an effort to determine whether there exists dormant

evidence which might require submission of the case to a jury").

Despite Dr. Chawla's failure to cite any supporting authority, his focus on Mr.

Hooker's actions and reference to "rubber stamps" could be construed as an attempt to

hold LMC liable under the subordinate bias or "cat's paw" theory.  *See Lobato v. N.M.

Env't Dept.*, 733 F.3d 1283, 1294 (10th Cir. 2013).[15]  Under the subordinate bias theory,

---

[15]The "cat's paw" theory derives its name from a fable in which a monkey convinces a gullible cat to pull chestnuts out of a fire.  *See Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).  "As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat."  *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006).  In employment discrimination law, the "cat's paw" theory can apply when a biased subordinate who lacks decision-making authority uses the formal decision maker "as a dupe in a deliberate scheme to trigger a discriminatory employment action."  *Id*. (citation omitted).  "The 'rubber stamp' doctrine has a more obvious etymology, and refers to a situation in which a decisionamker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate."  *Id.*

an employer can be liable for an adverse employment decision if a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action.  *Id.* (citing *Staub v. Proctor Hosp.*, --- U.S. ----, 131 S.Ct. 1186, 1194 (2011)).  However, for Dr. Chawla to prevail, he must make both a factual showing that Mr. Hooker harbored a national origin or religious animus toward Dr. Chawla and "a convincing legal claim" that such animus should be imputed to LMC, despite the fact that Mr. Hooker did not himself have the power to terminate Dr. Chawla.  *See BCI*, 450 F.3d at 484.  Therefore, Dr. Chawla must show that discriminatory animus motivated Mr. Hooker to seek Dr. Chawla's termination and that Mr. Hooker's biased actions were the proximate cause of the ERC's ultimate decision to terminate him.  *Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 796 (10th Cir. 2014) (unpublished).  An independent investigation and an exercise of judgment by an unbiased party does not, in all cases, break the causal chain, but an employer is not liable "if the employer independently verifies the facts and does not rely on the biased source."  *Lobato*, 733 F.3d at 1294.

Mr. Hooker was certainly aware that a PIP may lead to disciplinary actions, including termination, and that LMC would typically not terminate employees after a single PIP.  Docket No. 34-12 at 2, pp. 125:12-126:15.  And yet Dr. Chawla fails to identify specific facts, as is his burden to do, upon which to rest the conclusion that Mr. Hooker's ultimate goal was Dr. Chawla's termination or that termination was likely to result from Dr. Chawla's mere placement on the 2012 PIP.  Even assuming that Mr. Hooker had such a goal, Dr. Chawla fails to satisfy the causation element.  There is no evidence that Ms. Kaplan interviewed Mr. Hooker as part of her investigation.  Thus, Mr.

Hooker cannot be considered a direct source of information for the ERC regarding Dr. Chawla's 2012 performance. *Cf. Lobato*, 733 F.3d at 1296. In addition, Mr. Hooker did not explicitly recommend that Dr. Chawla be terminated and, after January 2012, had no further role in evaluating Dr. Chawla's performance. Dr. Chawla appears to claim that, because Mr. Hooker's discriminatory animus caused the mischarging investigation, the 2011 PIP, and the 2011 basic contributor rating, and the 2012 PIP, Mr. Hooker caused the investigation report to include mention of these events, which in turn was a proximate cause of Dr. Chawla's termination. Docket No. 41 at 20-21. However, Dr. Chawla fails to support his argument with reference to specific facts. As such, the Court rejects any argument that LMC can be held liable under a subordinate bias theory. *See Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1253 (10th Cir. 2006) ("we cannot find the requisite causation given that Mr. Lesley merely conducted an investigation but made no recommendation to the decision makers or otherwise participated in the decision to terminate Mr. Young").

For the foregoing reasons, LMC's motion for summary judgment is granted with respect to Dr. Chawla's third and sixth claims for discriminatory discharge. *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1114 (10th Cir. 2007) ("[I]t appears that Steve Lovas, the president of the region in which Ms. Timmerman's branch was located, made the final termination decision, and Linda Sincoff, an employee in [HR], made the recommendation that she be fired. Because there is no evidence that Ms. Johnson actually caused Ms. Timmerman's termination, nor that Mr. Lovas was merely a rubber stamp for Ms. Johnson's alleged prejudice, Ms. Timmerman's claims against U.S. Bank necessarily fail.").

### B.  Retaliation

Title VII prohibits retaliation against individuals who oppose discriminatory employment practices in complaints or investigations of employment practices prohibited by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must prove three elements: "(1) protected employee action; (2) adverse action by an employer either after or contemporaneous with the employee's protected action; and (3) a causal connection between the employee's action and the employer's adverse action."  *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264-65 (10th Cir. 2007).  As to the third element, plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Center v. Nassar*, 133 S.Ct. 2517, 2534 (2013).  If plaintiff can establish a prima facie case, defendant must then articulate a legitimate, nondiscriminatory or non-retaliatory reason to support its employment decision.  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006).  At that point, the burden shifts back to plaintiff to demonstrate that the defendant's legitimate reason is pretext.  *Id.*

"Protected opposition can range from filing formal charges to voicing informal complaints to superiors."  *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).  "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [anti-discrimination statutes]."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).  Dr. Chawla need only

show that, "when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory." *Hertz*, 370 F.3d at 1016.  A causal connection "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *See Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997). Temporal proximity can be "sufficient to allow an inference that a causal connection existed between the internal grievance and the decision to terminate [plaintiff]." *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (determining 24 days between complaint and termination sufficient to create inference of causal connection); *see also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting that a period of six weeks gives rise to a rebuttable inference of a causal connection).[16]

LMC does not dispute that Dr. Chawla took protected action in complaining about discrimination.  Docket No. 34 at 19.  Dr. Chawla identifies three retaliatory actions: (1) the 2011 basic contributor rating, (2) placement on the 2012 PIP, and (3) termination.  Docket No. 41 at 21.[17]  Dr. Chawla's lone assertion with respect to the

---

[16]Although the Supreme Court in *Nassar* clarified that the "but for" causation standard applies in Title VII retaliation cases, the Court did not appear to limit the evidence upon which plaintiff can rely in satisfying the causal element.  *See Nassar*, 133 S.Ct. at 2534; *Finn v. Suncor Energy USA, Inc.*, No. 12-cv-03024-JLK, 2014 WL 2993647, at *6 (D. Colo. July 3, 2014) (citing *Nassar* and *Anderson*).

[17]Although LMC indicates that Dr. Chawla's retaliation claims were additionally based upon the 2011 PIP and the mischarging investigation, Dr. Chawla does not appear to assert that those events are part of his retaliation claims.  *Id.*  Moreover, the mischarging investigation and the 2011 PIP were initiated prior to Dr. Chawla's first complaint of discrimination.  *See Jencks*, 479 F.3d at 1264 (noting that adverse actions must occur either after or contemporaneous with the protected action).

causal element is that each allegedly adverse action "closely followed Dr. Chawla's protected activity." Docket No. 41 at 22. He does not otherwise explain the basis for his claims other than to state that the facts "pled within the Verified Complaint clearly demonstrate that the Plaintiff meets his *prima facie* burden." *Id.* This general citation to the record is plainly insufficient to meet Dr. Chawla's burden of designating specific facts that show a genuine issue for trial and such insufficiency is, by itself, a basis to grant LMC's motion. *See Adler*, 144 F.3d at 671. Nonetheless, the Court will address each alleged retaliatory action in turn. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 at 69 (2006) ("the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint").

### 1. Basic Contributor Rating

LMC does not dispute that a basic contributor rating is an adverse employment action and that the action took place after Dr. Chawla's August 2, 2011 and September 22, 2011 complaints.[18] On September 29, 2011, Mr. Hooker was notified that he was the subject of an investigation of Dr. Chawla's complaints. Docket No. 37-2 at 5. However, Dr. Chawla does not contest that Mr. Nichols had a role in assigning the basic contributor rating and identified no specific facts upon which to conclude that Mr. Nichols was aware of Dr. Chawla's prior complaints of discrimination. *See Hinds v. Sprint/United Mgm't Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (holding that, in order to show a causal connection, plaintiff must present evidence "from which a reasonable

---

[18]To the extent Dr. Chawla's appeal to the EAC on September 16, 2011 can be construed as a complaint, there is no evidence that Mr. Hooker was aware of it. Mr. Hooker was, however, notified of Dr. Chawla's September 22, 2011 complaint, which, as noted above, contained substantially the same allegations as his EAC appeal.

factfinder could conclude that those who decided to fire him had knowledge of his protected activity"). Dr. Chawla also does not attack the stated justifications for the basic contributor rating. *See* Docket No. 37-5 at 1. Thus, Dr. Chawla's lone asserted basis for causation – temporal proximity – is an insufficient basis upon which to conclude that, but for Dr. Chawla's complaints of harassment, he would have received anything other than a basic contributor rating. Dr. Chawla's temporal argument is also plainly insufficient to establish that the PADR's stated reasons for his basic contributor rating are pretextual. *See Lobato v. N.M. Env't Dept.*, 733 F.3d 1283, 1293 (10th Cir. 2013) ("temporal proximity is sufficient to establish a prima facie case, but *not* to establish pretext, because the evidentiary burden is different" (quotations omitted; emphasis in original)).

### 2.  *2012 PIP*

The Court assumes, without deciding, that a PIP constitutes an adverse employment action. Dr. Chawla does not establish precisely when the decision was made to place him on the 2012 PIP. As of February 10, 2012, the day the 2012 PIP was issued, Dr. Chawla's only complaints of discrimination were in August and September 2011, of which Mr. Hooker was aware. To the extent Dr. Chawla argues that a temporal connection is sufficient to establish causation, Dr. Chawla fails to identify any other evidence indicating that, but for his discrimination complaints, he would not have been placed on the 2012 PIP. *Cf. Anderson*, 181 F.3d at 1179 ("a three-month period, standing alone, is insufficient to establish causation"). Dr. Chawla has therefore failed to satisfy the causal element. Moreover, even assuming that Dr.

Chawla established a prima facie case, LMC asserts that Dr. Chawla was placed on the 2012 PIP because of his 2011 basic contributor rating and failure to complete the 2011 PIP.  Docket No. 34 at 9, ¶ 51.  With respect to completion of the 2011 PIP, the only evidence Dr. Chawla offers to dispute LMC's contention that he failed to complete the 2011 PIP is his own subjective belief, *see* Docket No. 41-2 at 3, ¶ 24, which is insufficient to create a dispute of material fact.  *See Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) (noting that a plaintiff's subjective belief is insufficient to show pretext).  Dr. Chawla's basic contributor rating was supported by unrebutted reasons contained in the 2011 PADR and, per LMC policy, employees assigned to special programs who are rated as basic contributors are placed on a PIP.  Docket No. 35-2 at 1; *see also* Docket No. 37-6 at 4, p. 35:21-23.[19]  Dr. Chawla therefore fails to identify evidence upon which a reasonable juror could conclude that LMC acted in a retaliatory manner when placing him on the 2012 PIP.

_____

[19]Dr. Chawla's brief provides some suggestion that this policy was applied in a discriminatory manner because Mr. Wolk was rated a basic contributor in 2010 but was not subsequently put on a PIP.  Docket No. 41 at 17, ¶ 113.  A plaintiff can establish pretext by showing that he or she was treated differently from similarly situated employees who violated policies of "comparable seriousness."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F. 3d 1220, 1232 (10th Cir. 2000).  However, Dr. Chawla fails to meet his burden of showing that other employees were similarly situated in all material respects, including "relevant employment circumstances, such as work history and company policies."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  Dr. Chawla does not show that Mr. Wolk had comparable responsibility or was subject to a prior PIP and mischarging investigation, as Dr. Chawla was.  *See Furr*, 82 F.3d 980, 986 (10th Cir. 1996) ("Plaintiffs' evidence reveals that the newly hired individuals were not hired into Plaintiffs' positions or positions comparable to theirs.").  Mr. Hooker also suggested that, unlike Dr. Chawla, Mr. Wolk's performance improved.  Docket No. 41-9 at 11, p. 116:11-23.  Thus, to the extent Dr. Chawla asserts that placing him on the 2012 PIP pursuant to LMC policy was pretextual, he has failed to meet his burden.

### 3.  Termination

As discussed above, the ERC made the final decision to terminate Dr. Chawla's employment, but Dr. Chawla provides no evidence that the ERC was aware of his complaints.  Ms. Kaplan's investigation report contained no information regarding Dr. Chawla's protected activity.  *See generally* Docket Nos. 37-8, 37-9, 37-10, 37-11.  Mr. Facchinello states that he did not know whether Dr. Chawla "complained of discrimination or retaliation at the time while he worked at LMC."  Docket No. 39-6, at 2, ¶5.  Dr. Chawla fails to rebut this statement or identify evidence upon which a reasonable juror could conclude that Mr. Pierce was aware of Dr. Chawla's discrimination complaints.  *See Hinds v. Sprint/United Mgm't Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (holding that, in order to show a causal connection, plaintiff must present evidence "from which a reasonable factfinder could conclude that those who decided to fire him had knowledge of his protected activity").  Moreover, as discussed above, Dr. Chawla fails to rebut the predominant reason for his termination, namely, his poor performance in 2012.  *See Bryant*, 432 F.3d at 1127.  As such, Dr. Chawla fails to show that, but for his protected conduct, his termination would not have occurred.  To the extent Dr. Chawla asserts subordinate bias liability, for the above stated reasons, his argument fails.  Thus, Dr. Chawla's claim that his termination was motivated by retaliatory animus fails.

For the foregoing reasons, LMC's motion for summary judgment on Dr. Chawla's second and fifth claims for relief is granted.

### C.  Hostile Work Environment

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).  "To survive summary judgment on a claim alleging a . . . hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of [his protected status]."  *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012) (internal quotation marks omitted).  Dr. Chawla must also show that LMC is liable for any unlawful incidents of national origin-related or religious harassment.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  It is on the issue of liability that Dr. Chawla's claims fail as a matter of law.

The Court first turns to the scope of Dr. Chawla's claims.  As a threshold matter, Dr. Chawla's brief does not clearly identify the alleged incidents that form the basis of his hostile work environment claim, except to state, without citation to the record, that he was subject to "a steady barrage of comments at Lockheed from at least seven (7) identified co-workers including his own manager."  Docket No. 41 at 18-19; *see Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012) (to state a prima facie case, plaintiff must show that she was "targeted for harassment" because of her sex).  Dr. Chawla also fails to explain why each of the allegedly harassing statements was

motivated by religious or national origin-related animus.  Such failures are, by themselves, a sufficient basis to grant LMC's motion on Dr. Chawla's hostile work environment claims.  *See Thomas*, 968 F.2d at 1025.  Nonetheless, Dr. Chawla's Statement of Additional Disputed Facts sets forth nine incidents that could reasonably relate to Dr. Chawla's hostile work environment claim, which, for the purposes of this motion, the Court presumes to have occurred: One, Mr. Meek's February 17, 2010 question asking if the wound on Dr. Chawla's head was "from beating yourself," which Dr. Chawla believed was an implied reference to a Shia Muslim style self beating.  Docket No. 41 at 14, ¶ 85.  Two, Mr. Harden's February 21, 2010 question asking if Dr. Chawla's shaved head was part of a "Muslim ritual."  Docket No. 41 at 14, ¶ 86.  Three, Mr. Keel's March 16, 2011 statement that the photograph on Dr. Chawla's identification badge "looked like a terrorist."  Docket No. 41 at 14, ¶ 87.  Four, Mr. Hooker's question, during the summer of 2011, asking Dr. Chawla about his Indian and Pakistani ancestry and about whether the two ethnic halves were in conflict.  Docket No. 41 at 14, ¶ 89.  Five, Mr. Wolk, on August 10, 2011, calling Dr. Chawla "Muneeb Gaddafi," in reference to former Libyan leader Moammar Gaddafi.  Docket No. 41 at 14, ¶ 88.  Six, Mr. Olsen, on October 19, 2011, telling Dr. Chawla that "he'd been complaining to security about Plaintiff and couldn't believe that 'they still let you through the doors.'"  Docket No. 41 at 14, ¶ 90.  Seven, Mr. Hooker's November 22, 2011 email to a group of employees containing the cartoon that Dr. Chawla found offensive.  Docket No. 41 at 14, ¶ 91.  Eight, Mr. Espelage's April 19, 2012 conversation with plaintiff where Mr. Espelage stated "they thought you were a terrorist."  Docket No. 41 at 14, ¶ 92.  Nine, Mr. Espelage's April 30, 2012 conversation where he told Dr. Chawla to "'put on a turban'

and drive to Buckley Air Force Base."  Docket No. 41 at 14, ¶ 93.[20]  Ten, although not

referenced in Dr. Chawla's declaration or statement or Statement of Additional Disputed

Facts, Dr. Chawla reported to LMC that, at the end of June 2011, Mr. Barron told Dr.

Chawla that his badge picture looked like a picture of a terrorist.  Docket No. 37-2 at 8.

For the purposes of determining LMC's liability, the Court concludes that Dr. Chawla's

hostile work environment claims are based upon these ten incidents.[21]

The Court turns to the issue of liability and, for the purposes of this analysis,

assumes, without deciding, that the identified incidents are sufficient to show the

existence of an actionable hostile work environment.  The Supreme Court has ruled

that employers are not automatically liable for sexual harassment perpetrated by their

employees.  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v.

City of Boca Raton*, 524 U.S. 775, 807 (1998).  The Court, however, held that

employers may be liable for the conduct of their employees under two theories: (1)

negligence and (2) vicarious liability.  *Helm v. Kansas*, 656 F.3d 1277, 1285 (10th Cir.

2011).  Although Dr. Chawla's claims concern incidents with non-supervisory co-

workers and Mr. Hooker, a supervisory co-worker, Dr. Chawla does not raise the issue

of vicarious liability,[22] relying instead on the theory that LMC is liable on the basis of

---

[20]Dr. Chawla reported to LMC that Mr. Espelage directed these comments at a co-worker, rather than at Dr. Chawla. Docket No. 39-1 at 4, 5.

[21]Dr. Chawla's brief identifies an additional incident with Mr. Wolk and an additional incident with Mr. Hooker, Docket No. 41 at 14-15, ¶¶ 94-95, but neither incident appears to be motivated by racial or religious animus and Dr. Chawla does not clearly argue otherwise.

[22]Under vicarious liability, an employer may be liable if a supervisor's harassing conduct culminates in a tangible adverse employment action for the employee.  *See*

negligence. Docket No. 41 at 19.

Under the negligence theory, an employer is liable only "if it knew or should have known" about the harassing conduct of a non-supervisory employee and failed to stop it. *Ellerth*, 524 U.S. at 759; *Bertsch*, 684 F.3d at 1027. To prove this theory of liability, Dr. Chawla must establish that (1) the employer had actual knowledge or constructive knowledge of the harassment and (2) the employer's remedial and preventative responses to the harassment were inadequate. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). Actual knowledge is demonstrable when the "plaintiff has reported harassment to management-level employees." *Id.* Because, as discussed above, the identified incidents of alleged harassment were all reported to LMC, the Court finds that LMC is chargeable with actual knowledge of the allegedly harassing conduct forming the basis of Dr. Chawla's claims.

The adequacy of an employer's response to incidents of racial or religious harassment is measured by "'whether the remedial and preventative action [is] reasonably calculated to end the harassment.'" *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1148 (10th Cir. 2008) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998). The Tenth Circuit has held that, generally, if the employer's response

---

*Faragher*, 524 U.S. at 807. Dr. Chawla does not, for example, identify the causal relationship between the two alleged incidents of harassment by Mr. Hooker and any adverse employment actions, such as Dr. Chawla's 2011 basic contributor rating, 2012 PIP, or termination. Moreover, Dr. Chawla does not establish that Mr. Hooker's harassing behavior is, by itself, sufficiently severe or pervasive so as to sustain a hostile work environment claim. *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007) (noting that severity and pervasiveness is evaluated according to the totality of the circumstances). Thus, even if vicarious liability were properly raised, Dr. Chawla makes no meaningful attempt to show that LMC should be held vicariously liable for Mr. Hooker's allegedly harassing conduct.

"ends the harassment by the employee in question, we presume that the remedial action was sufficient." *Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005); *see also Adler*, 144 F.3d at 676 ("A stoppage of harassment shows effectiveness, which in turn evidences . . . reasonable calculation."). In all cases, the employer is absolved of liability for acts of harassment by its employees so long as its remedial and preventative action is "reasonably calculated to end the harassment." *Duncan*, 397 F.3d at 1310 (quotation omitted).

Dr. Chawla provides no evidence that, once LMC responded to a complaint, the co-worker in question engaged in repeat harassment. Both of Mr. Hooker's alleged incidents of harassment occurred prior to LMC's investigation of those incidents. Mr. Hooker was given a verbal reprimand for sending the offensive email, Docket No. 38-7 at 1, and Dr. Chawla provides no evidence that Mr. Hooker subsequently engaged in harassing behavior. Mr. Espelage also engaged in two separate incidents of harassment, both of which occurred prior to LMC's investigation. Mr. Espelage was disciplined, Docket No. 39-4, and Dr. Chawla provides no evidence that Mr. Espelage thereafter engaged in harassing behavior. Although Dr. Chawla is critical of LMC's investigation for failure to substantiate some of his complaints, he presents no evidence that a single co-worker engaged in repeat harassing behavior after LMC responded to his complaints. Thus, because the harassment by individual co-workers did not persist, LMC's response was presumptively effective. *Cf. Adler*, 144 F.3d at 676 (noting that, when the harassment by the employee persists, the court examines "the timeliness of the plaintiff's complaint, whether the employer unduly delayed, and whether the response was proportional to the seriousness and frequency of the harassment").

Dr. Chawla's criticisms of LMC's response fail to rebut this presumption.  Docket No. 41 at 20.  First, Dr. Chawla fails to identify any evidence to suggest that his co-workers were somehow motivated to engage in harassing behavior based on the alleged inadequacy of LMC's response.  *See Adler*, 144 F.3d at 678 (holding that, unless plaintiff establishes "a nexus between a prior response and later harassment by others, the later harassment is irrelevant to the adequacy of the prior response").  Second, Dr. Chawla claims that LMC failed to investigate all of Dr. Chawla's complaints, but, as noted above, he fails to identify any incidents of harassment that were either unreported or reported but not investigated.  Docket No. 41 at 20.  Third, he claims that the investigation process was "delayed for months," which appears to be a reference to Ms. Campbell's six-week delay in investigating the February 14, 2012 complaint.  *Id.*  However, Ms. Campbell offered an unrebutted explanation for the delay and, more importantly, there is no evidence that the co-workers identified in the February 14, 2012 complaint engaged in any subsequent improper behavior that an earlier investigation may have prevented.  Fourth, although Dr. Chawla suggests that LMC investigated acts of discrimination without questioning witnesses, he fails to identify any specific instance where such a failure took place.  *Id.*  Fifth, Dr. Chawla does not explain why the only reasonable response to his complaints would have been to remove the offending co-workers from his team.  *See Adler*, 144 F.3d at 676 ("an employer is not required to terminate a perpetrator except where termination is the only response that would be reasonably calculated to end the harassment").  Although Mr. Nichols suggests that Dr. Chawla may have at one point requested a transfer, Dr. Chawla does not explain why LMC's alleged failure to transfer him was the only reasonable response to his

45

harassment complaints.  Dr. Chawla's criticisms of LMC's response therefore fail to create a genuine dispute of fact.[23]  Thus, even assuming the existence of an actionable hostile work environment, Dr. Chawla has failed to show that LMC's remedial and preventative responses to the claimed harassment were inadequate and therefore that LMC is liable.  *See Ellerth*, 524 U.S. at 765.

For the foregoing reasons, LMC's motion for summary judgment on Dr. Chawla's first and fourth claims for relief is granted.

### D.  Remaining Claims

Having dismissed Dr. Chawla's claims arising under federal law, the Court next addresses the issue of whether it should exercise jurisdiction over Dr. Chawla's remaining claims, which are based upon state law.  While courts may exercise supplemental jurisdiction over state law claims if there is otherwise a jurisdictional basis for doing so, 28 U.S.C. § 1367(c)(3) states that a court may decline to exercise jurisdiction over such claims if "the district court has dismissed all claims over which it has original jurisdiction."  When § 1367(c)(3) is implicated in the Tenth Circuit, courts are advised to dismiss pendent state law claims "'absent compelling reasons to the contrary.'"  *Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (reversing the district court's grant of

---

[23]To the extent Dr. Chawla argues that LMC "failed to follow its own rules" by not passing all discrimination allegations to the ERC for a final disposition, Docket No. 41 at 20, Dr. Chawla fails to show that LMC's policies contain any such requirement.  *Cf.* Docket No. 41-32 at 5 ("The ARC will only make recommendations to the ERC for cases in which it determines suspension, demotion, or termination of employment is appropriate.").  Dr. Chawla does not appear to additionally criticize LMC's harassment policies or other preventative measures.  *See Adler*, 144 F.3d at 673.

summary judgment on state law claims); *Endris v. Sheridan Cnty. Police Dep't*, 415 F.

App'x 34, 36 (10th Cir. 2011) ("any state-law claims for assault and battery or mental

and emotional injury were inappropriate subjects for the exercise of pendent jurisdiction

where all federal claims had been dismissed").  *But see Henderson v. Nat'l R.R.*

*Passenger Corp.*, 412 F. App'x 74, 79 (10th Cir. 2011) (finding no abuse of discretion in

trial court's decision to retain jurisdiction over state law claims after plaintiff voluntarily

dismissed claims arising under federal law).  Finding no compelling reason here to

retain jurisdiction, the Court will dismiss Dr. Chawla's remaining claims without

prejudice.  *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced

within the statute of limitations to be re-filed if involuntarily dismissed because of lack of

jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996)

(interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is

pending in federal court); *see also City of Los Angeles v. Cnty. of Kean*,

328 P.3d 56, 65 (Cal. 2014) (noting that interpretations of § 1367(d) vary between

jurisdictions).

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 34] is

**GRANTED** in part and **DENIED** in part as indicated in this Order.  It is further

**ORDERED** that Dr. Chawla's first, second, third, fourth, fifth, and sixth claims for

relief are **DISMISSED** with prejudice.  It is further

**ORDERED** that Dr. Chawla's seventh, eighth, ninth, tenth, and eleventh claims

for relief are **DISMISSED** without prejudice.  It is further

       **ORDERED** that, within 14 days of the entry of judgment, defendant may have its

costs by filing a bill of costs with the Clerk of the Court.  It is further

       **ORDERED** that this case is dismissed in its entirety.


       DATED September 22, 2014.

                            BY THE COURT:


                         s/Philip A. Brimmer
                        PHILIP A. BRIMMER
                        United States District Judge